UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MARIA OTANEZ,

                                         Plaintiff,

                          v.

CAROLYN W. COLVIN, *Acting Commissioner of Social Security*,

                                     Defendant.

------------------------------------------------------------X

14 Civ. 8184 (KPF)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 12, 2016

KATHERINE POLK FAILLA, District Judge:

Plaintiff Maria Otanez filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security (the "Commissioner") denying Otanez's application for Social Security Disability Insurance benefits based on a finding that Otanez did not meet the Act's criteria for disability. The parties have filed cross-motions for judgment on the pleadings. Because the Commissioner's decision did not properly apply the treating physician rule, Plaintiff's motion is granted insofar as it seeks remand, Defendant's motion is denied, and the ALJ's opinion is reversed.

## BACKGROUND[1]

Otanez first filed a Title II application for Disability Insurance benefits on January 24, 2011, alleging disability as of June 2, 2010.  (SSA Rec. 44).  The Commissioner denied this initial claim on August 1, 2011.  (*Id.* at 98).  Otanez subsequently requested and received a hearing before an Administrative Law Judge (the "ALJ"), pursuant to 20 C.F.R. § 404.929, at which she appeared with counsel and testified with the assistance of a Spanish-language translator on January 29, 2013.  (*Id.* at 74).

### A.    Otanez's History and Impairments

At the hearing, Otanez provided information about her education, employment history, living circumstances, and daily activities.  She explained that she immigrated to the United States from the Dominican Republic in 1998, and that she had received an eighth-grade education.  (SSA Rec. 82).  She reported that she lived with her two children, a 23-year-old son and a 19-year-old daughter, and that while she had previously held various jobs, she had not been working since June 2, 2010 — the date as of which she claimed disability.  (*Id.* at 76-77).  Immediately prior to that date Otanez had worked as a home attendant, caring for an elderly woman full-time.  (*Id.* at 77).  On June 2, 2010, Otanez was riding in an ambulance to take her client to the hospital when the ambulance was struck by another car.  (*Id.* at 79).  Otanez

---

[1]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #7) filed by the Commissioner.  For convenience, Plaintiff's supporting memorandum (Dkt. #10) is referred to as "Pl. Br.," Defendant's supporting memorandum (Dkt. #13) as "Def. Br."; and Defendant's memorandum in opposition (Dkt. #14) as "Def. Opp."

sustained injuries in the crash, for which she received (and, at the time of the hearing, continued to receive) both medical treatment and worker's compensation payments in the bi-weekly amount of $215.00.  (*Id.* at 80).

Otanez testified that as a result of her injuries, she suffered chronic pain in her head, neck, shoulders, and knees, and had seen multiple doctors to treat both physical and psychological symptoms.  (SSA Rec. 80-81).  She additionally testified that her ability to complete daily tasks was limited: She could cook "a little bit," but had to have her children shop for food and do the laundry.  (*Id.* at 82-83).  She rode the bus independently when she was not "feel[ing] really bad," but could not take the train alone due to anxiety.  (*Id.* at 83-84).  As a consequence of her inability to work outside the home and her chronic pain, Otanez became anxious and depressed, conditions for which she received psychological treatment.  (*Id.* at 81).  Otanez additionally attended physical therapy two to three times a week to address her ongoing physical symptoms.  (*Id.* at 83).

Otanez's then 18-year-old daughter, Katherine Otanez ("Katherine"), completed a third-party function report for her mother on July 20, 2011.  (SSA Rec. 218).  Katherine's report primarily corroborated her mother's account of her limitations, stating that Otanez suffered from dizziness, neck and back pain, and depression.  (*Id.*).  Katherine described her mother's daily activities as consisting of attending physical therapy, watching television, and sometimes making herself food.  (*Id.* at 219).  She stated that her mother needed help dressing, bathing, and doing her hair, and that Otanez could only prepare

3

simple meals because she was unable to stand long enough to cook anything more.  (*Id.* at 220).  Katherine noted that she helped with household chores, and that her mother did not do any shopping or leave the house other than to attend doctors' appointments.  (*Id.* at 220-21).  In regards to her mother's mental health, Katherine reported that she felt her mother had changed, stating that "[s]he cries most of the time and has no interest in the things she used to like."  (*Id.* at 224).

**B.     Otanez's Physical Evaluations and Treatment**

Otanez has seen numerous medical professionals during the period since her accident.  In setting forth the relevant factual background, the Court focuses on the practitioners and medical evidence most germane to the contentions of the parties.

**1.     Radiology Reports**

Otanez received a Magnetic Resonance Imaging test (an "MRI") of her lumbar spine at the Bronx Park Medical Pavilion; the test was then interpreted in a report dated June 24, 2010.  (SSA Rec. 319).  The imaging showed mild disc desiccation and loss of disc space height at multiple vertebrae, as well as small posterior facet joint effusions at vertebrae L4-L5 and L5-S1 consistent with arthritic changes.  (*Id.*).  A disc bulge with bilateral foraminal components was visible, as well as thickening of the posterior longitudinal ligament, which was mildly indenting the thecal sac.  (*Id.* at 320).[2]  Finally, "a left foraminal

---

[2]     The thecal sac, also called the dural tube, is a fluid-filled sac in which the spinal cord floats.  *Tethered Cord*, American Association of Neurological Surgeons,

disc protrusion … appear[ed] to be compromising the left foramen." (*Id.*). The spinal imaging was otherwise unremarkable.

An X-ray of Otanez's shoulders, elbows, knees, chest, and spine conducted on June 29, 2010, at Greater New York Radiology, P.C., showed normal bones, joints, and soft tissue. (SSA Rec. 323-28). X-rays taken a year later, on June 30, 2011, showed normal images for the lumbosacral spine, and mild disc thinning in the cervical spine. (*Id.* at 431-32).

### 2. Dr. Okon Umana, M.D.

Otanez has seen Dr. Okon Umana, an internal medicine practitioner, for physical therapy sessions and examinations a total of 15 times over the period spanning from June 16, 2010, to October 26, 2012. (SSA Rec. 332, 348, 371, 374, 384, 400, 406, 547, 549, 555, 561, 567, 575, 580, 585). According to a letter written by Dr. Umana dated July 9, 2010, Otanez was receiving treatment for headaches, problems with her cervical spine, dizziness, and bilateral shoulder problems. (*Id.* at 277). He reported that these conditions arose out of Otanez's June 2, 2010 car accident, and that they left her "totally disabled." (*Id.*). Consequently Otanez would be "unable to return to work for the next six weeks." (*Id.*). Despite the limited temporal scope of this prognosis, an evaluation from Dr. Umana two years later, on August 26, 2012, stated

---

http://www.neuroandspine.com/conditions/ pediatric-neurosurgery/tethered-cord (last visited Jan. 11, 2016).

5

that, in Dr. Umana's opinion, Otanez was "totally disabled and [could] not [presently] return to work." (*Id.* at 544).

Dr. Umana completed multiple medical source statements over the course of his treating relationship with Otanez. The first of these, completed on October 4, 2011, reported that Otanez could continuously sit for 30 minutes at a time, stand for 10 minutes, and walk — with the assistance of a cane — for 10 minutes. (SSA Rec. 491). Over the course of an eight-hour workday, Otanez could sit for a total of one hour, stand for a total of 10 minutes, and walk for a total of 30 minutes. (*Id.*). Under "clinical findings," Dr. Umana listed cervical and lumbosacral radiculopathy, and internal derangement of both shoulders (*id.* at 490), additionally noting that Otanez could not "bend, stoop, lift or carry heavy obj[ects]" as a result of her condition (*id.* at 495).

Dr. Umana's examination report from approximately one year later, dated July 12, 2012, reported "[r]estricted [cervical, lumbosacral,] and shoulder [range of motion]," and that Otanez was "unable to bend, lift, or carry." (SSA Rec. 522). Dr. Umana described Otanez's prognosis with treatment as "guarded." (*Id.* at 523). A medical source statement completed by Dr. Umana two months later, on September 30, 2012, reduced the time for which Otanez could continuously sit to 15 minutes, but increased the time for which she could continuously stand and walk to 15 and 20 minutes, respectively. (*Id.* at 531). He reported that over the course of an eight-hour workday Otanez could sit for 30 minutes, stand for 30 minutes, and walk for 40 minutes. (*Id.*). Other limitations included an inability to lift any amount over five pounds, as well as

an inability to bend, squat, crawl, or climb.  (*Id.* at 532).  In a report dated October 26, 2012, Dr. Umana continued to describe Otanez as "totally disabled," and stated that she continued to complain of severe pain in her neck, back, right shoulder, right knee, and both legs.  (*Id.* at 548).

### 3.   Dr. Jacquelin Emmanuel, M.D.

Otanez saw orthopedic surgeon Dr. Jacquelin Emmanuel on two separate occasions.  At her first visit, on August 23, 2010, Dr. Emmanuel conducted an independent medical examination for Otanez's worker's compensation application.  (SSA Rec. 282-84).  Dr. Emmanuel reported that Otanez suffered from restricted range of motion and mild tenderness of the muscles along her cervical spine, but no muscle spasm.  (*Id.* at 283).  Otanez had normal deep tendon reflexes and full muscle strength, a normal gait, and no pain radiation, numbness, or tingling.  (*Id.*).  Dr. Emmanuel diagnosed Otanez with a resolving cervical and lumbar spinal sprain/strain, resulting in a "25% temporary ... disability" that precluded Otanez from lifting objects weighing over 25 pounds and from standing, walking, or sitting for long periods.  (*Id.* at 284).

Dr. Emmanuel conducted her second independent examination of Otanez for worker's compensation on May 2, 2011, this time focusing her examination on Otanez's shoulders.  (SSA Rec. 285-87).  She reported finding no atrophy, sensory loss, or tenderness, and related that Otanez had full range of motion. (*Id.* at 286).  Dr. Emmanuel opined that Otanez had "no causally related disability" stemming from her previous accident, and could work "without boundaries or restrictions."  (*Id.*).

7

### 4.    Dr. Stanley Leibowitz, M.D.

Dr. Stanley Leibowitz, an orthopedic surgeon, issued a report stating that he had examined Otanez on July 12, 2010, at which time Otanez reported constant pain.  (SSA Rec. 375).  Dr. Leibowitz tested and recorded Otanez's range of motion for various spinal movements, reporting cervical spine movement restrictions of 17% for flexion and extension, 20% for rotation, and 11% for lateral bending, and lumbar spine movement restrictions of 6% for flexion, 33% for extension, 20% for bending, and 25% for rotation.  (*Id.*).  A straight leg raising test "[e]licited pain at 45% of normal." (*Id.*).  Dr. Leibowitz concluded that his "[f]unctional level evaluation demonstrate[d] [Otanez's] inability to perform usual and customary daily activities." (*Id.* at 378).

Dr. Leibowitz again examined Otanez on January 31, 2011, noting shoulder tenderness, a spasm in the trapezius muscle, and a positive impingement test in both shoulders.  (SSA Rec. 352-53).  At a follow-up appointment on March 21, 2011, Dr. Leibowitz again recorded Otanez as having a positive impingement test in both shoulders.  (*Id.* at 350).

### 5.    Dr. Andrew M.G. Davy, M.D.

Dr. Leibowitz referred Otanez to anesthesiology and pain specialist Dr. Andrew M.G. Davy, who examined Otanez on August 30, 2010.  (SSA Rec. 273).  Otanez reported being in constant pain, with her pain rating (on a scale of 1 to 10, with 10 being the most severe) an 8 out of 10 at its best, and a 10 out of 10 at its worst.  (*Id.*).  Dr. Davy tested Otanez's flexion, reflexes, and pain sensitivity, and reported findings of disc pathology, lumbar and cervical

radiculopathy, and multiple myofascial trigger points.  (*Id.* at 275).  Dr. Davy summarized his examination by saying that Otanez's state of "temporary total disability" was "not responding favorably to conservative therapy," but that Otanez was "an excellent candidate for [] routine interventional treatment."  (*Id.* at 276).  Otanez thereafter returned to see Dr. Davy for a series of epidural injections, and Dr. Davy additionally prescribed Otanez Motrin, Zanaflex, a back brace, and continued physical therapy.  (*Id.* at 278-79, 288-90, 316-18, 329, 337-38).

### 6.    Dr. William Lathan, M.D.

Dr. William Lathan, a family medicine practitioner, performed a consultative examination of Otanez at the request of the Social Security Administration (the "SSA") on June 27, 2011.  (SSA Rec. 430).  Dr. Lathan reported that Otanez showed no acute distress and walked with a normal gait, though she could not walk on her heels and toes.  (*Id.* at 428).  He further noted normal cervical flexion, extension, and rotation, but did not test Otanez's ability to extend, flex, or rotate at the lumbar spine.  (*Id.* at 429).  Dr. Lathan recorded a negative straight leg test for both legs, stable and nontender joints, and full strength in Otanez's upper and lower extremities.  (*Id.*).  In his medical source statement at the conclusion of the evaluation, Dr. Lathan stated only that Otanez had "a moderate restriction for bending, lifting, pushing, pulling, squatting, standing, and walking."  (*Id.* at 430).

### 7.    Dr. Eleanor Lipovsky, M.D.

Internist Dr. Eleanor Lipovsky conducted an examination of Otanez on January 16, 2013 — after the initial denial of Otanez's benefits application, but prior to her hearing before the ALJ.  (SSA Rec. 592).  Dr. Lipovsky reported tenderness and spasm of the muscles along the cervical spine, with range of motion restrictions ranging from 50% to 66% of normal.  (*Id.* at 594).  Dr. Lipovsky similarly noted tenderness, muscle spasm, and restricted motion in Otanez's right elbow and lumbar spine.  (*Id.* at 594-95).  Finally, Dr. Lipovsky reported decreased range of motion and increased muscle spasm in Otanez's knees, as well as impaired motor strength in both legs.  (*Id.* at 595).  In her treatment plan, Dr. Lipovsky recommended continued physical therapy and use of Motrin to relieve pain, and opined that Otanez was "<u>totally</u> disabled."  (*Id.* at 596 (underscoring in original)).  In her discussion of her findings, Dr. Lipovsky stated that she believed Otanez's symptoms were directly related to her prior accident, finding that

> [t]here has been severe trauma to the neck, lower back, right elbow and both knees.  This causes the vertebrae to be misaligned, ligament and muscle to be overstretched, nerve to be irritated, and various soft tissues to be inflamed.  Injuries of this nature and the body's response to them can go on for months or years.

(*Id.* at 597).  In conducting her examination, Dr. Lipovsky reviewed MRIs of Otanez's cervical and lumbar spine.  (*Id.* at 596).  MRIs of Otanez's shoulders, ordered by Dr. Lipovsky, revealed some thickness and tearing of the left

shoulder tendons, and supraspinatus and infraspinatus tendinosis in the right shoulder.  (*Id.* at 599, 601).

### 8.    Dr. Sun Jin Kim, M.D.

Otanez visited Dr. Sun Jin Kim, an orthopedist at Montefiore Department of Orthopedics, on February 4, 2013, for complaints of bilateral knee pain. (SSA Rec. 22).  After performing various function tests, Dr. Kim diagnosed Otanez with mild bilateral osteoarthritis of both knees and injected each knee with a lidocaine and Depo-Medrol mixture to relieve her pain.  (*Id.* at 23).[3]

Dr. Kim saw Otanez for a follow-up visit on May 6, 2013, at which time Dr. Kim reported that Otanez had "not been responding to the injections." (SSA Rec. 19).  Dr. Kim stated that "some of [Otanez's] discomfort may be coming from her back and the fact that she has fibromyalgia," and that he was "not sure that there is any surgery to improve her knee condition."  (*Id.* at 20).

## C.    Otanez's Psychological Treatment and Evaluations

### 1.    Dr. Dmitri Bougakov, Ph.D.

Psychologist Dr. Dmitri Bougakov conducted a consultative evaluation of Otanez for the SSA on July 8, 2011.  (SSA Rec. 444).  Otanez stated that she was currently taking ibuprofen, meclizine, tizanidine, and lisinopril.  (*Id.* at 445).  She reported suffering from various depression and anxiety symptoms since her accident in June 2010.  (*Id.*).  Dr. Bougakov noted that Otanez

---

[3]     Depo-Medrol is the brand name for an injectable corticosteroid, methylprednisolone, used to reduce inflammation.  *Methylprednisolone*, Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/methylprednisolone-injection-route/description/drg-20075216 (last visited Jan. 11, 2016).

walked with a cane, but that her gait, posture, and motor behavior were otherwise normal.  (*Id.*).  Her affect displayed a normal range, she spoke appropriately, her mood was neutral, and she was orientated to her surroundings.  (*Id.*).  Her attention and concentration were intact, though her memory was mildly impaired.  (*Id.* at 446).  In describing her daily activities, Otanez reported that she could dress, bathe, and groom herself; cook three times a week, clean twice a week, and do laundry once a week; and that she could not travel alone due to dizziness and headaches.  (*Id.*).  She reported receiving extensive help in daily activities from her children, and spending her time primarily by going to doctors' appointments.  (*Id.*).

Dr. Bougakov diagnosed Otanez with depressive disorder secondary to her physical medical condition.  (SSA Rec. 447).  He described her prognosis as "[f]rom guarded to fair," and stated that while she could perform simple tasks and follow simple instructions, she was "limited in [her] ability to learn new tasks and perform complex tasks."  (*Id.* at 446).  She could "make appropriate decisions, relat[e] adequately with others, and deal with stress, but on a limited basis."  (*Id.*).

### 2.    Jean Walker Weille, L.C.S.W.

Licensed Clinical Social Worker Jean Walker Weille saw Otanez at the Urban Health Plan facility in the Bronx concerning the latter's complaint of post-traumatic stress disorder ("PTSD") on July 22, 2011.  (SSA Rec. 503). Weille's treatment report reflects an appropriate affect and cooperative attitude,

but dysphoric and tearful mood.  (*Id.* at 504).  Weille assessed Otanez as indeed suffering from PTSD.  (*Id.*).

### 3.    Dr. Jorge N. Kirschtein, M.D.

The following day, on July 23, 2011, Otanez returned to Urban Health Plan and saw Dr. Jorge N. Kirschtein for a psychiatric evaluation.  (SSA Rec. 500).  Dr. Kirschtein noted Otanez's use of a cane, but otherwise described Otanez's appearance, activity, speech, and thought process as "unremarkable."  (*Id.* at 501).  She was alert and oriented.  (*Id.*).  Her affect was constricted but stable, and her mood was anxious and depressed.  (*Id.*).  Memory, attention, insight, and judgment were all intact.  (*Id.*).  Dr. Kirschtein diagnosed Otanez with "Major depression and PTSD" and recommended that she begin taking trazodone, Wellbutrin, and Celexa.  (*Id.* at 501-02).

### 4.    Dr. J. Kessel, M.D.[4]

Psychiatrist Dr. J. Kessel completed a consultative evaluation of Otanez's mental residual functional capacity ("MRFC") for the SSA on August 1, 2011.  (SSA Rec. 482).  Dr. Kessel found that Otanez suffered from a medically determinable impairment — namely, depressive disorder — that did not satisfy the diagnostic criteria for mental disability.  (*Id.* at 469, 477).  The doctor noted mild limitations in Otanez's ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace.  (*Id.* at

---

[4]    The record does not disclose Dr. Kessel's first name.

476).  Dr. Kessel additionally noted a moderate limitation in Otanez's ability to respond appropriately to changes in the work setting.  (*Id.* at 481).

In the narrative portion of the report, Dr. Kessel stated that "the case evidence suggests that [Otanez] is mentally capable of independent [activities of daily living] and travel....  Because of her history and her current symptomatic complaints, [she] has some limitations in adaptation, but these are less than significant at the present time."  (SSA Rec. 482).

### 5.    Dr. Debra H. Goldman, Ph.D.

Dr. Debra H. Goldman, a psychologist, completed a medical source statement for Otanez on September 21, 2011.  (SSA Rec. 487-89).  She recorded Otanez as having no restriction upon her ability to understand, remember, or carry out simple instructions, or to interact appropriately with the public.  (*Id.* at 487-88).  She found Otanez moderately restricted in her ability to make simple work-related decisions, interact appropriately with a supervisor or co-workers, and respond appropriately to usual work situations; markedly restricted in her ability to understand, remember, and carry out complex instructions; and extremely restricted in her ability to make complex work-related decisions.  (*Id.*).

### 6.    Dr. Joseph Charles, M.D.

On October 20, 2012, psychiatrist Dr. Joseph Charles filled out a report regarding Otanez's mental impairments, in which he stated that he had been treating Otanez since January 2012 and that her most recent visit was on the date of the report.  (SSA Rec. 535).  Dr. Charles diagnosed Otanez with PTSD,

stating that while she generally had "good insight as to her symptoms," she had "been unable to manage these symptoms to date." (*Id.* at 536).

Dr. Charles stated that Otanez was receiving weekly individualized therapy, and was taking Celexa and trazodone. (*Id.* at 537). He checked boxes indicating that Otanez had marked limitations in performing activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (*Id.* at 538-39). He additionally indicated that Otanez continually suffered from "[e]pisodes of deterioration or decompensation in work or work-like settings which cause [her] to withdraw from that situation or to experience exacerbation of signs and symptoms." (*Id.* at 539). Finally, Dr. Charles recorded Otanez as having marked limitations in understanding and memory, as well as in sustained concentration, persistence, and ability to adapt to certain work situations. (*Id.* at 540-42).

### D.     The Vocational Expert's Hearing Testimony

The Vocational Expert (the "VE") provided testimony at the January 29, 2013 hearing before the ALJ. (SSA Rec. 84-89). The VE first summarized Otanez's past employment history, stating that she had previously worked as (i) a home attendant, which is categorized as a medium-exertion, semi-skilled position; (ii) a machine operator, which is a heavy-exertion, unskilled position; and (iii) a cosmetics salesperson, which is a light-exertion, semi-skilled position. (*Id.* at 85).

The ALJ next posed a hypothetical to the VE: He asked whether jobs existed in the national economy, not involving hazards or heights, that could be

performed by an individual of Otanez's age, education, and past experience and who had the residual functional capacity to lift and carry up to 20 pounds occasionally and ten pounds frequently; stand and walk with normal breaks for a total of about six hours during an eight-hour workday; sit with normal breaks for about six hours out an eight-hour workdays; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently reach overhead.  (SSA Rec. 86).  Such positions would also have to accommodate non-exertional limitations by requiring no more than the performance of simple, routine, repetitive tasks that can be explained, and which involve only occasional changes in routine or contact with others.  (*Id.*).  The VE opined that a significant number of employment opportunities existed for an individual with the specified restrictions, including the light-exertion, unskilled positions of housekeeper/cleaner, assembler, and office helper.  (*Id.* at 86-87).  The ALJ then added a condition to the hypothetical, asking whether positions would still exist for the previously-described individual if she would be off-task one percent of the time, to which the VE answered "[n]o" — no jobs would exist for such an individual.  (*Id.* at 87).

Otanez's counsel then questioned the VE, asking her to consider a hypothetical individual of Otanez's age and experience who was limited, *inter alia*, to lifting and carrying no more than five pounds; sitting and standing for a total of 30 minutes each, and walking a total of 40 minutes over the course of an eight-hour workday; never bending, squatting, crawling, climbing, or

16

operating arm controls with her hands; and only occasionally reaching.  (SSA Rec. 88).  After clarifying that the individual in question could only sit, stand, and walk for a combined total of one hour and 40 minutes per day, the VE gave the opinion that "there would be no full-time job position this individual would be able to do."  (*Id.* at 88-89).

## E.    The ALJ's Opinion Denying Benefits

On February 8, 2013, the ALJ rendered his decision finding Otanez not disabled within the meaning of the Act.  (SSA Rec. 44-58).  As a threshold matter, the ALJ found that Otanez met the Act's insured status requirement through December 31, 2015.  (*Id.* at 46).  Moving then into the prescribed five-step analysis utilized for Social Security claims, the ALJ found that Otanez satisfied the first two prongs:  (i) she had not engaged in substantial gainful activity since the alleged onset date of her disability, and (ii) she had severe impairments, including degenerative disc disease of the cervical and lumbar spine; internal derangement of both shoulders; obesity; an affective disorder; and an anxiety disorder.  (*Id.*).[5]

---

[5]    The SSA employs a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled.").  The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If [s]he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider [her] [*per se*] disabled[.]  Assuming the claimant does not have a listed

At step three of his analysis, the ALJ determined that Otanez was not *per se* disabled, as she did not have any impairments which, either individually or in the aggregate, met or medically equaled the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (SSA Rec. 47).  Consequently he proceeded to step four:  the determination of Otanez's residual functional capacity ("RFC").  After considering the record before him, the ALJ found that Otanez could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for a total of about six hours during an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently reach overhead; and occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.* at 48-49).  She was limited to work not involving machinery or heights, and could only perform simple, routine, and repetitive tasks that can be explained and that involve only occasional changes in routine and contact with others.  (*Id.* at 49).

In determining Otanez's RFC, the ALJ considered both the medical evidence contained in the record, and also Otanez's own testimony regarding her capabilities and symptoms.  (SSA Rec. 48-56).  When weighing the various and sometimes conflicting statements from healthcare professionals, the ALJ

---

impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

noted the presumption of controlling weight that typically attaches to the opinion of a treating physician, but went on to explain that the objective evidence in the record did not support the opinions of treating physicians Dr. Umana, Dr. Lipovsky, and Dr. Charles.  (*Id.* at 55).  Consequently, their respective opinions received only minimal weight, while the opinions of Dr. Goldman and consultative examiners Dr. Bougakov and Dr. Lathan were accorded greater authority.  (*Id.* at 56).

In regards to Otanez's own account of her limitations, the ALJ found that her statements were not entirely credible.  (SSA Rec. 52-54).  He engaged in a two-step analysis of Otanez's alleged impairments, first considering whether her medically determinable impairments could reasonably be expected to cause her reported symptoms, and then turning to whether her account of her resulting limitations was credible in light of the record.  (*Id.* at 53).  While the ALJ determined that Otanez's medically determinable impairments could reasonably give rise to her symptoms, he found the severity of her reported restrictions to be at odds with the objective evidence before him.  (*Id.*).  As a result, he found that Otanez's account of her limitations did not warrant a different RFC finding from that suggested by the medical source opinions of Drs. Bougakov, Goldman, and Lathan, and the additional diagnostic evidence in the record.  (*Id.* at 56).

At the fourth stage of his analysis, the ALJ found Otanez unable to perform any of her past relevant work.  (SSA Rec. 56).  Hence he moved on to the fifth and final step of his disability determination and considered whether,

in light of Otanez's age, education, language skills, work experience, and RFC, jobs existed in significant numbers in the national economy that Otanez could perform.  (*Id.* at 57).  The ALJ noted that, because Otanez suffered from both exertional and non-exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, did not mandate a specific result, but rather provided a framework for determining whether or not Otanez qualified as disabled.  (*Id.*).  The ALJ found, based upon the testimony provided by the VE at the prior hearing, that Otanez could perform the requirements of certain jobs existing in significant numbers in the national economy.  A non-exhaustive list of such jobs included housekeeper/cleaner, assembler, and office helper.  (*Id.*).  Because Otanez retained sufficient functionality to work in one of these positions, the ALJ ultimately determined that she was not disabled within the meaning of the SSA.  (*Id.* at 58).

### F.    Procedural History

Otanez requested a review by the Appeals Council of the ALJ's decision denying her benefits, which request was denied on August 21, 2014.  (SSA Rec. 1).  Otanez then filed her Complaint, appealing the Commissioner's denial of her benefits application, on October 14, 2014.  (Dkt. #1).  The Commissioner filed her answer on June 12, 2015 (Dkt. #6), and filed her instant motion for judgment on the pleadings on July 15, 2015 (Dkt. #9).  Otanez filed her cross-motion for judgment on the pleadings on August 10, 2015 (Dkt. #12), to which the Commissioner filed her opposition on August 24, 2015 (Dkt. #14).  No

further submissions have been filed, and the Court therefore considers the Commissioner's August 24 memorandum as concluding the briefing.

## DISCUSSION

**A.      Applicable Law**

**1.      Motions Under Federal Rule of Civil Procedure 12(c)**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy*, LLC, 647 F.3d 419, 429 (2d Cir. 2011).  When considering either type of motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); s*ee also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [Plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

21

2.      **Review of Determinations by the Commissioner of Social Security**

In order to qualify for disability benefits under the Act, a claimant must demonstrate her "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A court must uphold a final administrative determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard. *Selian*, 708 F.3d at 417 ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a

correct legal standard." (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g) ("If there is substantial evidence to support the determination, it must be upheld.").  Where administrative findings are supported by substantial evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the [Commissioner] are conclusive unless they are not supported by substantial evidence."  (citing 42 U.S.C. § 405(g)).

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard."  *Brault* v. *Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  To make the determination of whether the SSA's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

Finally, the presiding ALJ has an affirmative obligation to develop the administrative record.  *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).  This means that the ALJ must seek additional evidence or

clarification when the "report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, [or] the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

## B.    Analysis

### 1.    The ALJ's Erred in Part in Applying the Treating Physician Rule

When assigning relative weight to various opinions from medical professionals, both the SSA and the Second Circuit adhere to a treating physician rule, under which "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence."  *Rosa* v. *Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *see also* 20 C.F.R. § 404.1527(c)(2).  In circumstances where a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight the opinion should receive.  *See* 20 C.F.R. § 404.1527(d)(2).  They include, *inter alia*, the "[l]ength of the treatment relationship and the frequency of examination"; the "[n]ature and extent of the treatment relationship"; the "relevant evidence ..., particularly medical signs and laboratory findings," supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues.  *Id.* § 404.1527(d)(2)(i)-(ii), (3)-(5); *see also id.*

24

§ 404.1527(d) (listing the same factors in determining how much weight should be given to any medical opinion).  In general, "the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." *Id.* § 404.1527(d)(2)(i).  Finally, the SSA's "regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.'" *Halloran* v. *Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (alterations in the original)).

In the present case, Otanez argues that the ALJ committed legal error in affording the opinions of several of Otanez's treating physicians — namely, Drs. Umana, Lipovsky, and Charles — only minimal weight.  (Pl. Br. 16-22).  She particularly faults the ALJ's purported substitution of his own judgment for that of her treating physicians, and for his general failure to provide sufficient reasons for his decision to credit her consultative examiners' reports over those of her treating physicians.  (*Id.* at 19-22).  She highlights the relative lack of familiarity that her non-treating examiners had with her case in arguing that the ALJ accorded excessive weight to their views.  (*Id.* at 20-22).

Defendant, on the other hand, contends that the ALJ properly assessed the various medical opinions in the record and provided adequate reasons for his decision not to afford controlling — or even significant — weight to the respective opinions of Drs. Umana, Lipovsky, and Charles.  (Def. Br. 21-23; Def. Opp. 1-8).  Defendant particularly cites the ALJ's findings that those

25

opinions were contradicted by substantial evidence in the record and lacked objective clinical support.  (Def. Br. 21-22; Def. Opp. 2-5, 8).

For the reasons discussed below, the Court finds that, while the ALJ adequately applied the substance of the treating physician rule to the opinions of Drs. Umana and Charles, he failed to justify adequately his assignment of only "minimal weight" to the opinion of Dr. Lipovsky.

### a.   The ALJ Adequately Weighed the Opinion of Dr. Umana

Considering first Dr. Umana's treatment reports, the ALJ stated that Dr. Umana's assessment of Otanez's restrictions was

> not supported by substantial clinical examination findings (which fail to reveal persistent neurological deficits in the lower extremities of the sort which could reasonably limit the claimant's ability to stand, walk, lift and carry) or by the substantial diagnostic imaging results (such as the spinal and shoulder MRI results not revealing acute abnormalities).

(SSA Rec. 55).  This justification for discounting Dr. Umana's opinion presents two potential problems.  First, the ALJ's apparent decision not to accord weight to Dr. Umana's findings due to a specific lack of "persistent neurological deficits" or "acute abnormalities" of the spine and shoulder would seem to constitute a substitution of the ALJ's own opinion for that of the physician.  An ALJ is free to discount a professional medical opinion due to a lack of support or the presence of contradictory evidence; he may not, however, dictate what specific clinical findings are required to justify a given medical opinion.  *See Rosa*, 168 F.3d at 79 (reversing an ALJ's disability determination where the ALJ failed to accord weight to a treating physician's opinion because the

26

physician "did not report findings of muscle spasm to corroborate any loss of motion," thereby substituting his own judgment for that of the physician); *Balsamo* v. *Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (reversing where an ALJ discounted a treating physician's opinion due to the fact that there was no evidence of "atrophy of any muscle groups … as one would expect … based on the claimant's allegation of constant and totally disabling pain," where no medical source suggested such atrophy should necessarily be present).

Furthermore, while the clinical and diagnostic evidence did not provide the particular support sought by the ALJ, neither was it completely negative: On the contrary, an initial MRI showed disc desiccation and loss of height between discs — findings that presumably contributed to the ALJ's determination that Otanez suffered from degenerative disc disease — and later imaging of her shoulder revealed thickening, tearing, and tendinosis. (*See* SSA Rec. 46, 319-21, 598-99). Given the lack of medical source evidence suggesting that particular objective evidence would be required to support Dr. Umana's findings, the ALJ erred insofar as he rejected Dr. Umana's opinion on the basis of specific absent factors that the ALJ thought should be present.

Were that the only ground upon which the ALJ rested his assessment of Dr. Umana's opinion, the Court would be inclined to find that the ALJ improperly applied the treating physician rule in this instance. However, the ALJ additionally noted that Dr. Umana's opinion set forth a more restrictive view of Otanez's limitations than those of other assessing physicians. The primary contradicting assessment relied on by the ALJ comes from Dr. Lathan,

a consultative examiner who saw Otanez for a single examination.  Dr. Lathan did not set out specific durations for which Otanez could perform various activities during a normal workday, but rather stated only that Otanez had "a moderate restriction for bending, lifting, pushing, pulling, squatting, standing and walking." (SSA Rec. 430).  Dr. Lathan's report also states that he did not evaluate Otanez's ability to squat, or her range of motion in her lumbar spine. (*Id.* at 428-29).  These omissions strike the Court as notable, given that the ALJ rested his RFC determination largely on Dr. Lathan's findings.

Dr. Lathan's report is not the only evidence in the record, however, suggesting that Dr. Umana's assessment was too restrictive.  The reports of treating physician Dr. Emmanuel, which reports the ALJ acknowledged having reviewed, ultimately found that, based on the clinical evidence, Otanez could work "without boundaries or restrictions." (SSA Rec. 286).  This extremely broad view of Otanez's restrictions is admittedly itself somewhat at odds with the bulk of the record (including Dr. Lathan's assessment of "moderate restrictions").  However, as a treating physician (and, unlike Dr. Umana, an orthopedic specialist), Dr. Emmanuel provides an opinion that can both corroborate Dr. Lathan's more moderate view and serve as a counterpoint to Dr. Umana's more restrictive assessment of Otanez's functionality.  Ultimately, the ALJ acted within the bounds of his discretion in finding that, together, the evidence provided by Drs. Emmanuel and Lathan outweighed the assessment

of Dr. Umana, and that Dr. Umana's report of Otanez's limitations was accordingly too severe.[6]

### b.   The ALJ Improperly Discounted the Opinion of Dr. Lipovsky

Considering the opinion of Dr. Lipovsky, the ALJ had no duty to credit her conclusion that Otanez was "totally disabled," as the power to make such a determination rests solely with the Commissioner.  *Snell* v. *Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("The final question of disability is … expressly reserved to the Commissioner." (citing 20 C.F.R. § 404.1527(e)(1))).  This does not mean, of course, that the ALJ may summarily dismiss the medical findings upon which Dr. Lipovsky based this assessment.  Here, the ALJ assigned only "minimal weight" to Dr. Lipovsky's opinion, characterizing her diagnoses of (i) "post-concussion syndrome" and "concussion with a loss of consciousness," and (ii) impaired lower extremity motor strength as reflecting "factual inaccuracies" and inconsistent with the lumbar spine MRI.  (SSA Rec. 55).  The Court finds that the ALJ failed to provide good reasons for all but dismissing Dr. Lipovsky's assessment.

In regards to the first point, that ALJ reasoned that Dr. Lipovsky's report did not warrant presumptive weight because Otanez has "no [] history" of

---

[6]   The Court notes that while it is not remanding on the basis of the ALJ's application of the treating physician rule to Dr. Umana's reports, the ALJ's determination that the opinions of Drs. Lathan and Emmanuel outweighed that of Dr. Umana seems to have rested in part on the fact that the ALJ found the opinion most supportive of Dr. Umana — that of Dr. Lipovsky — to warrant only minimal weight.  (SSA Rec. 55). Given the Court's finding, *infra*, that the ALJ erred in his application of the treating physician rule to Dr. Lipovsky's opinion, a reconsideration of the balance of the evidence in the record may well be warranted upon remand.

concussion.  (SSA Rec. 55).  However, the initial report completed for Otanez's worker's compensation application in June 2010 states that she suffered "concussion [without] loss of consciousness."  (*Id.* at 298).  Furthermore, the report of Dr. Emmanuel states that Otanez did in fact report a "loss of consciousness."  (*Id.* at 285).  In other words, Otanez's medical record is inconsistent in its account of whether or not she suffered head trauma in her accident, and in light of the conflicting accounts, the ALJ could not simply label Dr. Lipovsky's diagnosis as a "factual inaccuracy" based on the omission of a concussion diagnosis in Otanez's initial accident report.  *See Wagner* v. *Sec'y of Health & Human Servs.*, 906 F.2d 856, 861 (2d Cir. 1990) (rejecting argument that the Commissioner can "discard a treating doctor's opinion on the basis of prior omissions in the record").  Furthermore, given that the diagnosis of "concussion with loss of consciousness" seems to have been largely irrelevant to Dr. Lipovsky's assessment of any restrictions Otanez suffered, the presence of such a diagnosis does not provide "good reason" for dismissing the doctor's other clinically-based medical findings.

As to the fact that Dr. Lipovsky's report of lower extremity weakness contradicts other evidence in the record (*compare* SSA Rec. 593 (report of Dr. Lipovsky, finding lower extremity weakness), *with id.* at 284 (report of Dr. Emmanuel, finding normal strength in Otanez's lower extremities); *but see id.* at 394 (initial consultation report from the New York Rehabilitation Center, finding some muscle weakness in the right lower extremity)), this may be reason not to afford her account controlling weight as to that particular alleged

symptom.  The Court cannot agree, however, that such an inconsistency serves

to invalidate Dr. Lipovsky's opinion in all other, unrelated respects.

Dr. Lipovsky's objective clinical examination revealed significant range of

motion limitations and muscle spasm, all of which the ALJ appears not to have

credited, despite the supporting MRI findings of "significant underlying

tendinosis" and "partial linear interstitial tear in the anterior fibers of the

infraspinatus tendon."  (*Id.* at 598).  Absent any proffered "good reasons" for

his affording only minimal weight to Dr. Lipovsky's assessment in regards to

these objective findings, the Court must find that the ALJ failed to apply the

treating physician rule correctly to the opinion of Dr. Lipovsky.  The Court

consequently remands for reconsideration.  *See, e.g., Halloran*, 362 F.3d at 33

("We do not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physicians opinion and we will

continue remanding when we encounter opinions from ALJs that do not

comprehensively set forth reasons for the weight assigned to a treating

physician's opinion.").[7]

### c.    The ALJ Adequately Weighed the Opinion of Dr. Charles

Finally, turning to opinion of Dr. Charles, Otanez argues that the ALJ

erred in affording his opinion less weight than those of Drs. Bougakov and

---

[7]      The Court acknowledges that in some circumstances, a failure to adhere to the treating
physician rule may constitute harmless error.  *See, e.g., Zabala* v. *Astrue*, 595 F.3d 402,
409 (2d Cir. 2010) (declining to remand even though the ALJ failed to satisfy the
treating physician rule where "application of the correct legal principle could lead [only
to the same] conclusion" (quoting *Johnson* v. *Bowen*, 817 F.2d 983, 986 (2d Cir. 1987))).
Where, as here, however, the ALJ's discounting of a first treating physicians' reports is
premised on the findings of other physicians, the failure to apply the presumption of
correctness to a second treating physician's opinion absent good reasons will not be

Goldman.  All else being equal, Dr. Charles's opinion would indeed be entitled

to greater weight, given that of the three doctors he alone appears to have an

established treating relationship with Otanez.  However, the ALJ identified

notable inconsistencies in Dr. Charles's report: His global assessment of

function ("GAF") score for Otanez was 53, which indicates a moderate level of

impairment, yet he then stated that she was "markedly" impaired in her daily

activities.  (SSA Rec. 535, 538).[8]  As the ALJ explained, Dr. Charles's

assessment of Otanez's psychological restrictions was not only at odds with the

reports from other medical professionals, but it also did not coincide with

Otanez's own testimony regarding her current abilities.  *See Carroll* v. *Sec'y of*

*Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (stating that it is the

Commissioner's function to resolve evidentiary conflicts in the record).  On

---

harmless: Had Dr. Lipovsky's opinion been weighed more heavily, the Court cannot say whether the ALJ would have found that the opinion of Dr. Umana — a treating physician who saw Otanez 15 separate times — warranted only minimal weight.  *See Bonneau* v. *Astrue*, No. 13 Civ. 26 (CR), 2014 WL 31301, at *9 (D. Vt. Jan. 3, 2014) (finding an ALJ's failure to properly apply the treating physician rule not harmless where such failure influenced the ALJ's assessment of other evidence).

[8]     A GAF score of 51-60 indicates "moderate difficulty in social, occupational, or school functioning." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 429-36 (4th ed., text. rev. 2000) (hereinafter, "DSM–IV") 429-36, *reprinted in* SOPHIA F. DZIEGIELEWSKI, DSM-IV-TR IN ACTION 92 (2d ed. 2010).  However, the utility of this metric is debatable, particularly after its exclusion from the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders*.  *See Schneider* v. *Colvin*, No. 13 Civ. 0790 (MPS), 2014 WL 4269083, at *4 & n.5 (D. Conn. Aug. 29, 2014) ("Even prior to the release of the DSM-V in 2013, courts have held that an ALJ's failure to consider every GAF score is not a reversible error....  Since the issuance of the DSM-V, courts have become even more reluctant to find any error in the failure to consider a plaintiff's GAF scores."); *see also Mainella* v. *Colvin*, No. 13 Civ. 2453 (JG), 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) ("At a basic level, the Administration noted that '[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation.' ... Generally, the guidance instructs ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used." (internal citations omitted)).

these facts, the ALJ appropriately found that Dr. Charles's report should be accorded relatively less weight than those of Drs. Bougakov and Goldman, each of whom provided a more liberal picture of Otanez's mental functionality.  *See, e.g., Cichocki* v. *Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) ("Because [the treating physician's] medical source statement conflicted with his own treatment notes, the ALJ was not required to afford his opinion controlling weight.  The ALJ could therefore afford weight to the expert opinion provided by [the consultative examiner].").

### 2.    The ALJ Adequately Evaluated Otanez's Credibility

When considering a claimant's symptoms and their impact on the claimant's RFC, the ALJ follows a two-part process: First, the ALJ must determine whether medically acceptable clinical and laboratory diagnostic techniques establish an underlying physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. § 404.1529(a)-(b).  Second, once an underlying physical or mental impairment has been shown, the ALJ must evaluate the intensity, persistence, and limiting effect of the claimant's symptoms to determine the extent to which they restrict the claimant's functioning.  *Id.* § 404.1529(c).

When a claimant alleges that her symptoms result in a greater functional restriction than can be demonstrated by objective medical evidence, the ALJ considers evidence such as the claimant's daily activities; the type, dosage, effectiveness, and side effects of medications; treatments or pain relief measures; and other factors.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).  "[T]he

ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *McLaughlin* v. *Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980) (internal quotation marks and citation omitted). A reviewing court will uphold the ALJ's decision to discount a claimant's subjective complaints, such as complaints of pain, so long as the decision is supported by substantial evidence. *See Aponte* v. *Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Moreover, "an ALJ's credibility determination is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420; *see also Torres* v. *Colvin*, No. 12 Civ. 6527 (ALC) (SN), 2014 WL 4467805, at *4 (S.D.N.Y. Sept. 8, 2014) (collecting cases).

In the present case, Otanez argues that the ALJ improperly discredited her testimony, particularly by placing too much weight on her reported ability to perform certain basic household tasks. (Pl. Br. 24). The Commissioner counters Otanez's argument by highlighting the specific reasons provided by the ALJ in support of his credibility determination, including the lack of specific, objective evidence; the disconnect between Otanez's allegations of increasing pain and the absence of comparable increases in severity in her clinical findings; and inconsistencies in the record. (Def. Opp. 9-10). The Court finds that, under the deferential substantial evidence standard, the ALJ adequately assessed Otanez's credibility.

The ALJ found that, while Otanez's medically determinable impairments could reasonably be expected to cause her alleged symptoms, an evaluation of

factors including (i) her reported daily activities, (ii) the alleged increase in her symptoms, and (iii) the conservative nature of the treatment she had received led him to conclude that Otanez's testimony regarding the severity of her symptoms could not be credited.  (SSA Rec. 53).  The ALJ noted that Otanez's daily activities, "while restricted to a degree and while assisted by her two adult children, still reflect that she is able to perform some cooking and cleaning, and is able to travel by bus independently."  (*Id.*).  In sum, the ALJ's findings satisfy the "substantial evidence" threshold.

The Second Circuit has noted that an ALJ may not pick and choose evidence from the record to support his opinion; "[n]either may he mis-characterize a claimant's testimony or afford inordinate weight to a single factor, because '[a] claimant need not be an invalid to be found disabled under the Social Security Act.'"  *Meadors* v. *Astrue*, 370 F. App'x 179, 185 n.2 (2d Cir. 2010) (summary order) (quoting *Vasquez* v. *Barnhart*, No 02 Civ. 6751 (ARR) (RLM), 2004 WL 725322, at *11 (E.D.N.Y. Mar. 2, 2004)).  Contrary to Otanez's assertion, however, the ALJ did not engage in such selective consideration in his determination of Otanez's credibility.  Rather, the ALJ acknowledged that Otanez's testimony indicated some degree of restriction in daily life; it simply did not support a finding of total disability.  This assessment was bolstered by the fact that objective clinical and diagnostic evidence failed to corroborate Otanez's report of increasingly severe symptoms.

Regarding the third factor relied upon by the ALJ, the nature and effects of Otanez's treatment, the Court notes a slight tension between the factors set

forth by the Commissioner of Social Security and the applicable case law:
While Social Security Rule 96-7p directs ALJs to consider, *inter alia*, "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken," and "[t]reatment, other than medication, the individual uses or has used for relief of pain or other symptoms," the Second Circuit has repeatedly stated that a physician's recommendation of only conservative treatment does not provide substantial evidence that a claimant was not physically disabled during the relevant period.  *See Shaw* v. *Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *accord Burgess* v. *Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *Foxman* v. *Barnhart*, 157 Fed. App'x 344, 347 (2005) (summary order).  The ALJ appears to have placed some weight on the fact that Otanez's "treatment plan has been essentially conservative … [and] there is no evidence that she has been recommended for surgery for her spinal or shoulder impairments."  (SSA Rec. 54).  Such reasoning presupposes that surgery would be an appropriate treatment option for someone with Otanez's alleged restrictions; the ALJ may not make such suppositions.  *Greek* v. *Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion.").  In fact, at least one treating physician opined that Otanez was not responding to conservative treatment, and another indicated that while Otanez indeed seemed to be suffering from physical restrictions, surgery might not be an option for her.  (SSA Rec. 20, 276).  Nevertheless, in light of the ALJ's explicit consideration of other relevant factors and the substantial evidence

36

that exists in support of his ultimate determination, his perhaps undue emphasis on the conservative nature of Otanez's treatment recommendations does not invalidate his otherwise well-supported credibility determination.

## CONCLUSION

For the foregoing reasons, Otanez's motion for judgment on the pleadings is GRANTED insofar as it requests remand for rehearing; and the Commissioner's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     January 12, 2016
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge